IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

UNITED STATES OF AMERICA

v.

KENYON LAQUAN SPENCE,

*Defendant*.

Criminal Action No. ELH-18-0219

**MEMORANDUM OPINION**

Defendant Kenyon Spence entered a plea of guilty on October 29, 2018, to an Information (ECF 50) charging conspiracy to engage in sex trafficking of a minor. *See* Docket.  The plea was tendered pursuant to a Plea Agreement. ECF 54 (the "Plea Agreement"). Pursuant to Fed. R. Crim. P. 11(c)(1)(C), the parties agreed to a sentence ranging from 60 to 120 months of incarceration. *Id.* ¶ 9.

On February 8, 2019, the Court sentenced Spence to 75 months of incarceration, with credit for time served from December 2017 to May 2018.  ECF 75; ECF 81. He is currently serving his sentence at FCI Cumberland. *See Inmate Locator*, Bureau of Prisons, https://www.bop.gov/inmateloc/ (last visited June 14, 2022).

Spence has filed a pro se motion for compassionate release and for appointment of counsel (ECF 100, the "Motion"), supported by two exhibits. ECF 100-1; ECF 100-2.[1] The government opposes the Motion (ECF 107, the "Opposition"), and has submitted an exhibit.  ECF 113.[2] Spence replied (ECF 109, the "Reply"), accompanied by an exhibit. ECF 109-1.

---

[1] The Federal Public Defender declined to represent Spence in regard to compassionate release. ECF 103.

[2] The government stated that it had included Spence's medical records as an exhibit to the Opposition.  ECF 107 at 18 n.12. But, it inadvertently failed to do so. In response to this Court's orders (ECF 110; ECF 111), the government submitted the medical records, under seal.  They are docketed at ECF 113.  Spence replied prior to the docketing of the medical records.

No hearing is needed to resolve the Motion. For the reasons that follow, I shall deny the Motion.

## I.    Background

On April 18, 2018, Spence and codefendant Ruqayyah Thompson were charged with two counts of sex trafficking of a minor, in violation of 18 U.S.C § 1591(a). ECF 1 (Indictment).  As noted, on October 29, 2020, pursuant to a Plea Agreement (ECF 54) entered under Fed. R. Crim. P. 11(c)(1)(C), Spence pleaded guilty to an Information (ECF 50) charging him with conspiracy to engage in sex trafficking of a minor, in violation of 18 U.S.C §§ 1594(c) and 1591(a). *See* ECF 57.  Under Rule 11(c)(1)(C0, the parties stipulated to a sentence ranging between 60 and 120 months of imprisonment. ECF 54, ¶ 9.

The Plea Agreement included a Stipulation of Facts. ECF 54 at 9-11. According to the Stipulation, in October 2017 Spence and Thompson conducted prostitution activities in Maryland, New Jersey, and elsewhere.

On or about October 25, 2017, Spence and Thompson traveled from New Jersey to Maryland in a vehicle rented in the name of Thompson. *Id.* They brought three others with them: "Minor Female 1," who was then 17 years old; "Minor Female 2," then 15 years old; and an adult female known as "Destiny."  *Id.* at 9.

Minor Female 2 left her home on or about October 25, 2017. *Id.* She contacted Minor Female 1, whom she identified as her cousin, and asked to stay with her. *Id.* However, the two were made to leave the house by Minor Female 1's mother.  Thereafter, Minor Female 1 contacted Thompson, "who she had met [at] a party . . . ." *Id.* The minor females then met Thompson at a hotel in Elizabeth, New Jersey. *Id.*

The minor females thought that they were accompanying Thompson to New York City, and for reasons other than to engage in commercial sex acts. ECF 54 at 9. However, Spence drove everyone to a Ramada Inn in Pikesville, Maryland. *Id.* Thompson rented several rooms at the Ramada Inn, and she and Destiny engaged in commercial sex acts with customers. *Id.* Spence and Thompson also posted advertisements on the website Backpage, soliciting customers for commercial sex with Thompson or Destiny. *Id.*

Initially, Minor Females 1 and 2 stayed in Room 228; Thompson, Spence, and Destiny stayed in Room 205. *Id.* On October 26, 2017, the minor females were moved to Room 201. *Id.* While Minor Female 1 was still in Room 228, Thompson called and told her that a prostitution customer was at the hotel to see her. *Id.* A man came to Room 228 and asked Minor Female 1 if "she was going to do anything with him; when she said she would not engage in sex with him, the man left." *Id.*

Thompson contacted Minor Female 1 again and informed her that another customer was coming to meet her. *Id.* After a male knocked on Room 228, Minor Female 1 let him in. *Id.* The man asked for a "'short stay,'" meaning a commercial sex act of limited length. *Id.* at 10. Minor Female 1 "told him she did not want to have sex with him." *Id.* Instead, "they agreed he would pay her $100 if he could look at her naked body while he masturbated." *Id.* "The male then masturbated to the point of ejaculation." *Id.* He then left the room. *Id.* Minor Female 1 took the $100. *Id.*

A third customer knocked on Minor Female 1's door and "asked her to give him oral sex for $60." *Id.* Minor Female 1 "gave the man oral sex without a condom." *Id.* The customer ejaculated and then left the room. *Id.* During this encounter, Minor Female 2 was sitting in the

hotel bathroom. ECF 54 at 10. In the middle of the encounter, Minor Female 2 came out of the bathroom and witnessed Minor Female 1 and the man engaging in oral sex. *Id.*

After these encounters, Minor Female 1 gave the $160 that she had collected to Thompson, as she was told that Thompson had to pay for the room for the following night. *Id.* The following day, Thompson and Destiny arranged a new encounter for Minor Female 1. *Id.* While sitting in the rental car, Thompson and Destiny "encouraged" Minor Female 2 "to see the next prostitution customer." *Id.* "Spence, Thompson and Destiny instructed Minor Female 2 what she would need to do. . . ." *Id.*

When the customer arrived, Destiny walked with him and Minor Female 2 to Room 205 "and showed her where the condoms were." *Id.* "Destiny collected $100 from the customer and then left the room." *Id.* Minor Female 2 "told the customer she would not have sex with him" but would perform oral sex. *Id.* At the customer's request, Minor Female 2 put a condom on the male customer's penis and performed oral sex. *Id.* Either Thompson or Destiny called the room to see if Minor Female 2 was finished. *Id.* Minor Female 2 stated that she was not, "but wished that she was." *Id.*

A short time later, Minor Female 1 entered the room. *Id.* The customer became "upset" when Minor Female 2 did not "'finish' performing oral sex and an argument ensued." *Id.* The customer left and threated to call law enforcement. *Id.*

Shortly after, the police arrived and "'identified'" the two juveniles. *Id.* Spence, Thompson, and Destiny "fled in the rental car, abandoning the minors and returning to New Jersey." *Id.*

The police determined that Minor Female 2 was a juvenile who was reported missing from New Jersey. *Id.* Pursuant to a search warrant, the police recovered used condoms from the trash can in Room 205. *Id.* During the search of the hotel rooms, a Wells Fargo Bank account application

was located in the name of Ruqayyah Thompson. ECF 54 at 10. Spence knew or suspected that both Minor Females 1 and 2 were under the age of 18. *Id.*

The investigation revealed that Thompson had rented the rooms in the name of A.S., a woman living in Connecticut, and in whose name Thompson had obtained a Connecticut driver's license. *Id.* at 11. Thompson and Spence "had a history of renting rooms at this same Ramada Inn for the purposes of engaging in prostitution activity." *Id.* Thompson was the individual who engaged with the Ramada Inn to reserve and rent the rooms, but Spence gave her the money to pay for them. *Id.*

On October 31, 2017, a clerk at the Ramada Inn received a telephone call from telephone number 201-575-1020. *Id.* The male caller identified himself as "Laquan" and asked to retrieve his belongings from Room 205. *Id.* The caller was told that he would need to speak to the hotel manager because only the female who rented the hotel room would be allowed to recover the items. *Id.* On November 2, 2017, the hotel received another call from a male who identified himself as "'Jaquan Cooper (phonetic),'" who sounded like the previous caller. *Id.* This individual also wanted to retrieve the belongings left in Room 205. *Id.*

Sentencing was held on February 8, 2019. ECF 75. At the time of sentencing, the defendant was 39 years of age. ECF 79 (Amended Presentence Report or "PSR") at 2.[3] Defendant had an adjusted offense level of 38. *Id.* ¶ 43. After deductions for acceptance of responsibility, the PSR reflected a final offense level of 35. *Id.* ¶ 47. The PSR also reflected nine adult criminal convictions. *Id.*, ¶¶ 51-59. These convictions yielded a total of 13 criminal history points, which corresponded to a criminal history category of VI. *Id.* ¶ 60.

---

[3] The initial PSR is docketed at ECF 65.

In 1998, when Spence was 18 years of age, he was convicted in New Jersey of possession of a controlled dangerous substance. ECF 79, ¶ 51. He was sentenced to two years of probation. In June 2001, Spence was convicted in New Jersey of unlawful possession of a handgun. *Id.* ¶ 52. He was sentenced on May 3, 2002, to six years of incarceration. *Id.* Then, in March 2002, defendant was convicted in New Jersey of possession with intent to distribute heroin and possession or distribution of a controlled substance within 500 feet of a school. *Id.* ¶ 53. The sentencing took place on the same date as the sentencing with regard to the offense in paragraph 52, *i.e.*, May 3, 2002. *Id.* The defendant was sentenced to a concurrent term of six years of incarceration. *Id.*

Also in May 2002, Spence was convicted in New Jersey of contempt for violation of a judicial order; possession or distribution of a controlled substance within 500 feet of a school; and possession with intent to distribute heroin. *Id.* ¶ 54. Sentencing also occurred on May 3, 2002. The defendant was sentenced to one year of incarceration for contempt, and six years, concurrent, for the drug offenses. In June 2002, defendant was convicted in New Jersey of receiving stolen property, involving the theft of a "2000 Dodge." *Id.* ¶ 55. He was sentenced on August 16, 2002, to four years of incarceration. *Id.* The sentence appears to have been imposed concurrent with other sentences.

In 2006, Spence was convicted in Maryland of possession of marijuana. *Id*. ¶ 56. He was sentenced to 42 days of incarceration. *Id.* Spence was convicted in 2015 of violating an unspecified local ordinance in New Jersey. *Id.* ¶ 57. He was "assessed" $151. *Id.* The offense began as "Contempt and Credit Card Theft." *Id.* In 2016, Spence was convicted in New Jersey of receiving stolen property. *Id.* ¶ 58. He was sentenced to 47 days of incarceration, which was time served. *Id*.

Also in 2016, Spence was convicted in the Circuit Court for Baltimore County of driving without a license, for which he received probation before judgment. ECF 79, ¶ 59.

Based on a total offense level of 35 and a criminal history category of VI, the United States Sentencing Guidelines ("U.S.S.G" or "Guidelines") called for a period of incarceration ranging from 292 to 365 months. *Id.* ¶ 60. However, as noted, the parties stipulated to a sentence ranging between 60 and 120 months of imprisonment. ECF 54, ¶ 9.

At the time of sentencing, Spence was 39 years old, stood 5'11" tall, and weighed 265 pounds. ECF 79, ¶ 75. He reported that he had plates in his face due to being assaulted during his late twenties. *Id.* Spence's mother and brother both claimed that he had been shot in the buttocks when he was in his thirties. *Id.* The defendant advised that he has suffered from anxiety for the preceding 10 years. *Id.* ¶ 80. Further, he advised that he was prescribed Xanax. *Id.*

Defendant reported that he does not drink alcohol and that he has had no alcohol-related issues. *Id.* ¶ 81.  He began using marijuana when he was fifteen, but stopped due to anxiety. *Id.* And, he reported using Ecstasy "at approximately 18 or 19 years old." *Id.*

Spence reported "sporadic contact" with his father, who was not part of his life. *Id*. ¶ 75. However, he said that he had a "good childhood" thanks to his mother. *Id*. Spence  left high school in the 11th grade, but received his GED in 2002. *Id.* ¶ 83.[4]

Defendant sought a sentence of 60 months of imprisonment (ECF 66 at 1), and the government sought a "sentence at or near" 120 months. ECF 70 at 1. In its sentencing memorandum (ECF 70), the government offered a justification for agreeing to a sentencing range substantially below the Guidelines. *Id*. The government asserted this was "possibly the first time"

---

[4] According to the PSR, Spence's receipt of his GED in 2002 was not verified. ECF 79, ¶ 83. And, defendant's Reply includes a copy of the GED that he received in prison. *See* ECF 109-1 at 1.

Spence ever caused a minor to engage in commercial sex acts. ECF 70 at 1.[5] Additionally, in pursuing this activity, Spence did not use force or coercion, nor did it appear that the minor females were "plied with drugs or sexually assaulted." *Id.* Nevertheless, the government asserted that a "severe punishment" was required because Spence was "instrumental in causing two young women, a 17-year-old and a 15-year-old, to travel from New Jersey to an area of Baltimore, Maryland, and [sic] area with which they were unfamiliar, where he and his codefendant encouraged and facilitated them to perform sexual acts with paying customers." *Id.* at 2.

The Court sentenced defendant to a term of 75 months of imprisonment, along with 12 years of supervised release. ECF 81 (Judgment) at 2, 3. The Court observed that "the guidelines were draconian in the context of this case." ECF 82 (Statement of Reasons) at 3.

As mentioned, Spence is currently serving his sentence at FCI Cumberland. *See Inmate Locator*, BUREAU OF PRISONS, https://www.bop.gov/inmateloc/ (last visited July 13, 2022). According to the Bureau of Prisons ("BOP"), Spence has a projected release date of March 24, 2024. ECF 107 at 2. Including credit for time served, calculated from December 20, 2017, to May 30, 2018, Spence has served about 45 months of his 75-month sentence, or approximately 60%.

BOP medical records reflect that Spence received both doses of the Pfizer COVID-19 vaccine in March 2021. ECF 113 at 141.

The Opposition describes the Motion as "utterly bereft of any indication that [defendant] has exhausted administrative remedies." ECF 107 at 2. But, the government indicated that it communicated with the BOP, which confirmed that Spence exhausted his administrative remedies. *Id*. In any event, the Motion includes an administrative request by Spence for compassionate

---

[5] Defendant had previously engaged in commercial sexual acts (*see* ECF 54 at 9), but apparently had not done so with minors.

release, as well as a denial of this request by the Warden of his facility, dated February 8, 2021. *See* ECF 100-1.

## II.     Appointment of Counsel

The Motion is titled "Emergency Motion for Compassionate Release and Emer. Motion for Appointment of Counsel." ECF 100 at 1. However, the content of the Motion does not mention the issue of counsel at all, much less articulate any reason as to why counsel should be appointed.

There is no constitutional right to appointed counsel in a compassionate release proceeding. *See Pennsylvania v. Finley*, 481 U.S. 551, 555 (1987) ("The right to appointed counsel extends to the first appeal of right, and no further."). Thus, the determination to appoint counsel in this context rests solely within the discretion of the district court. *See United States v. Legree*, 205 F.3d 724, 730 (4th Cir. 2000) (explaining that a district court has the discretion to appoint defendant counsel under 18 U.S.C. § 3582(c) in exceptional circumstances).

Spence has not offered any justification for the appointment of counsel. Further, a review of defendant's case does not reveal any exceptional circumstances that would warrant the appointment of counsel. Therefore, I shall deny defendant's request for the appointment of counsel, without prejudice.

## III.     Standard of Review

Ordinarily, a court "may not modify a term of imprisonment once it has been imposed." 18 U.S.C. § 3582(c); *see United States v. Hargrove*, 30 F.4th 189, 194 (4th Cir. 2022); *United States v. Chambers*, 956 F.3d 667, 671 (4th Cir. 2020); *United States v. Jackson*, 952 F.3d 492, 495 (4th Cir. 2020); *United States v. Martin*, 916 F.3d 389, 395 (4th Cir. 2019). But, "the rule of finality is subject to a few narrow exceptions." *Freeman v. United States*, 564 U.S. 522, 526 (2011). One such exception is when the modification is "expressly permitted by statute." 18

U.S.C.        § 3582(c)(1)(B);        *see*        *Jackson*,        952        F.3d        at        495.

Commonly termed the "compassionate release" provision, 18 U.S.C. § 3582(c)(1)(A)(i) provides a statutory vehicle to modify a defendant's sentence if "extraordinary and compelling reasons warrant such a reduction." 18 U.S.C. § 3582(c)(1)(A)(i); *see Hargrove*, 30 F.4th at 194. This provision is an exception to the ordinary rule of finality. *United States v. Jenkins*, 22 F.4th 162, 169 (4th Cir. 2021).

Section 3582 was enacted as part of the Sentencing Reform Act of 1984. Originally, it permitted a court to alter a sentence only upon a motion by the Director of the BOP. *See* Pub. L. No. 98-473, § 224(a), 98 Stat. 2030 (1984). Thus, a defendant seeking compassionate release had to rely on the BOP Director for relief. *See*, *e.g.*, *Orlansky v. FCI Miami Warden*, 754 F. App'x 862, 866-67 (11th Cir. 2018); *Jarvis v. Stansberry*, No. 2:08CV230, 2008 WL 5337908, at *1 (E.D. Va. Dec. 18, 2008) (denying  compassionate release motion because § 3582 "vests absolute discretion" in the BOP).

For many years, the safety valve of § 3582 languished. The BOP rarely filed motions on an inmate's behalf. As a result, compassionate release was exceedingly rare. *See Hearing on Compassionate Release and the Conditions of Supervision Before the U.S. Sentencing Comm'n* 66 (2016) (statement of Michael E. Horowitz, Inspector General, Dep't of Justice) (observing that, on average, only 24 inmates were granted compassionate release per year between 1984 and 2013).

In December 2018, Congress passed the First Step Act of 2018 ("2018 FSA" or "First Step Act"), Pub. L. 115-391, 132 Stat. 5239 (2018); *see United States v. McCoy*, 981 F.3d 271, 275-76 (4th Cir. 2020). As amended by the 2018 FSA, 18 U.S.C. § 3582(c)(1)(A) now permits a court to reduce a defendant's term of imprisonment "upon motion of the Director of [BOP], *or upon motion of the defendant after the defendant has fully exhausted all administrative rights* to appeal a failure

of the [BOP] to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt

of such a request by the warden of the defendant's facility," whichever occurs first.  (Emphasis

added).  So, once a defendant has exhausted his administrative remedies, or after 30 days have

passed from the date on which the warden has received the defendant's request, he or she may

petition a court directly for compassionate release.  *Jenkins*, 22 F.4th at 169; *United States v.*

*Muhammad*, 16 F.4th 126, 129 (4th Cir. 2021); *McCoy*, 981 F.3d at 276.  That option constitutes

a sea change in the law.

Under § 3582(c)(1)(A), the court may modify the defendant's sentence if, "after

considering the factors set forth in section 3553(a) [of 18 U.S.C.] to the extent that they are

applicable," it finds:

> (i) extraordinary and compelling reasons warrant such a reduction; or
>
> (ii) the defendant is at least 70 years of age, has served at least 30 years in prison, pursuant to a sentence imposed under section 3559(c), for the offense or offenses for which the defendant is currently imprisoned, and a determination has been made by the Director of the Bureau of Prisons that the defendant is not a danger to the safety of any other person or the community, as provided under section 3142(g);
>
> and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission . . . .

*See United States v. Kibble*, 992 F.3d 326, 330 (4th Cir. 2021) (per curiam), *cert. denied*, ___ U.S.

___, 142 S. Ct. 383 (2021); *see also Hargrove*, 30 F.4th at 194; *United States v. High*, 997 F.3d

181, 186 (4th Cir. 2021).

Accordingly, in order to be entitled to relief under 18 U.S.C. § 3582(c)(1)(A)(i), the

defendant must demonstrate that (1) "extraordinary and compelling reasons" warrant a reduction

of his sentence; (2) the factors set forth in 18 U.S.C. § 3553(a) countenance a reduction; and (3)

the sentence modification is "consistent" with applicable policy statements issued by the

Sentencing Commission.   Notably, "Section 3582(c)(1)(A)(i) does not attempt to define the 'extraordinary and compelling reasons' that might merit compassionate release." *McCoy*, 981 F.3d at 276.

Generally, "the district court enjoys broad discretion in conducting a § 3582(c)(1)(A) analysis." *Jenkins*, 22 F.4th at 169.  But, the Fourth Circuit has said that, "[w]hen deciding whether to reduce a defendant's sentence under § 3582(c)(1)(A), a district court may grant a reduction only if it is 'consistent with applicable policy statements issued by the Sentencing Commission.'" *United States v. Taylor*, 820 F. App'x 229, 230 (4th Cir. 2020) (per curiam) (citing 18 U.S.C. § 3582(c)(1)(A)).

In U.S.S.G. § 1B1.13, titled "Reduction in Term of Imprisonment under 18 U.S.C. § 3582(c)(1)(A) Policy Statement," the Sentencing Commission addressed the "extraordinary and compelling reasons" that might merit compassionate release.  *See McCoy,* 981 F.3d at 276-77.[6]  In particular, U.S.S.G. § 1B1.13 provides that, on motion by the Director of the BOP, the court may reduce a sentence where warranted by extraordinary or compelling reasons (§ 1B1.13(1)(A)); the defendant is at least 70 years old and has served at least 30 years in prison (§ 1B1.13(1)(B)); the defendant is not a danger to the safety of any other person or to the community (§ 1B1.13(2)); and the reduction is consistent with the policy statement. U.S.S.G. § 1B1.13(3).

The Application Notes to U.S.S.G. § 1B1.13 are expansive, and indicate that compassionate release may be based on circumstances involving illness, declining health, age, exceptional family circumstances, as well as "other reasons."  U.S.S.G. § 1B1.13 App. Notes 1(A)-(D). Application Note 1(D), titled "**Other Reasons**," permits the court to reduce a

---

[6] The Sentencing Commission acted pursuant to 28 U.S.C. § 994(t) (directing Sentencing Commission to "describe what should be extraordinary and compelling reasons for sentence reduction"), as well as 28 U.S.C. § 994(a)(2)(C).  *See McCoy,* 981 F.3d at 276.

sentence where, "[a]s determined by the Director of the Bureau of Prisons, there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C)." U.S.S.G. § 1B1.13 App. Note 1(D). This is the "so-called, 'catch-all' category." *McCoy*, 981 F.3d at 276.

However, as the *McCoy* Court recognized, the policy statement in U.S.S.G. § 1B1.13 was issued in 2006 and was last updated in November 2018, *prior* to the enactment of the First Step Act. *McCoy*, 981 F.3d at 276. Of significance here, it is only "directed at BOP requests for sentence reductions." *Id.* (citing U.S.S.G. § 1B1.13). "By its plain terms, in short, § 1B1.13 does not apply to defendant-filed motions under § 3582(c)(1)(A)." *McCoy*, 981 F.3d at 282; *see also Jenkins*, 22 F.4th at 169; *United States v. Zullo,* 976 F.3d 228, 230 (2nd Cir. 2020); *United States v. Jones*, 980 F.3d 1098, 1100-02 (6th Cir. 2020); *United States v. Gunn*, 980 F.3d 1178, 1180 (7th Cir. 2020). In other words, the policy statement does not apply to this Court.

Indeed, "[a]s of now, there is no Sentencing Commission policy statement 'applicable' to [] defendants' compassionate-release motions, which means that district courts need not conform, under § 3582(c)(1)(A)'s consistency requirement, to § 1B1.13 in determining whether there exist 'extraordinary and compelling reasons' for a sentence reduction." *McCoy*, 981 F.3d at 283; *see also Hargrove*, 30 F.4th at 194-95. Consequently, district courts are "'empowered . . . to consider any extraordinary and compelling reason for release that a defendant might raise.'" *McCoy*, 981 F.3d at 284 (quoting *Zullo*, 976 F.3d at 230); *see also Jenkins*, 22 F.4th at 170.

"The factors applicable to the determination of what circumstances can constitute an extraordinary and compelling reason for release from prison are complex and not easily summarized." *Hargrove*, 30 F.4th at 197. Notably, "successful rehabilitation efforts can be considered" in regard to the analysis of extraordinary and compelling reasons. *United States v.*

*Harris*, 2022 WL 636627, at *1 (4th Cir. Mar. 4, 2022) (per curiam).  And, "when a defendant 'present[s] a significant amount of post-sentencing mitigation evidence, . . . a more robust and detailed explanation [is] required.'"  *United States v. Cohen*, 2022 WL 2314300, at *1 (4th Cir. June 28, 2022) (per curiam) (quoting *High*, 997 F.3d at 190) (alterations in *Cohen*).  Nevertheless, "rehabilitation alone cannot serve as a basis for compassionate release."  *United States v. Davis*, 2022 WL 127900, at * 1 (4th Cir. Jan. 13, 2022) (per curiam); *see McCoy*, 981 F.3d at 286 n.9; *Harris*, 2022 WL 636627, at *1; 28 U.S.C. § 994(t).

Moreover, the Guidelines "are not directly applicable to defendant-filed motions" under § 3582(c).  *Jenkins*, 22 F.4th at 169.  However, "the court may consider these guidelines in defining what should be considered an 'extraordinary and compelling circumstance' warranting a sentence reduction."  *Id.* (citing U.S.S.G. § 1B1.13); *see High*, 997 F.3d at 187.  Although there are currently no applicable policy statements for the Sentencing Commission that are applicable to compassionate release, U.S.S.G. § 1B1.13 "remains helpful guidance . . . ."  *McCoy*, 981 F.3d at 282 n.7; *see Hargrove*, 30 F.4th at 194.

As the movant, the defendant bears the burden of establishing that he is entitled to a sentence reduction under 18 U.S.C. § 3582.  *See*, *e.g.*, *United States v. Hamilton*, 715 F.3d 328, 337 (11th Cir. 2013); *United States v. Edwards*, 451 F. Supp. 3d 562, 565 (W.D. Va. 2020).  But, even if the defendant establishes an extraordinary and compelling reason that renders him eligible for a sentence reduction, the court must consider the factors under 18 U.S.C. § 3553(a) to determine whether, in its discretion, a reduction of sentence is appropriate.  *See Dillon v. United States*, 560 U.S. 817, 826-27 (2010); *Hargrove*, 30 F.4th at 195; *High*, 997 F.3d at 186; *see also United States v. Jones*, No. 22-6071, 2022 WL 2303960, at *1 (4th Cir. June 27, 2022) (per curiam) (noting that "a court need not explicitly make findings on extraordinary and compelling reasons where

consideration of the § 3553(a) factors counsels against release"); *United States v. Butts*, No. 21-6380, 2021 WL 3929349, at *2 (4th Cir. Sept. 2, 2021) (per curiam) (noting that, even if the district court finds extraordinary and compelling circumstances, it must consider the § 3553(a) factors to the extent applicable in exercising its discretion); *Kibble*, 992 F.3d at 329-30 (noting that district court must consider § 3553(a) factors when considering a motion to reduce sentence under § 3582(c)(1)(A) and district court enjoys broad discretion in conducting this analysis); *United States v. Trotman*, 829 F. App'x 607, 608 (4th Cir. 2020) (per curiam) (recognizing that, when considering a motion to reduce sentence under § 3582(c)(1)(A), the court must consider the sentencing factors under § 3553(a), to the extent applicable); *United States v. Chambliss*, 948 F.3d 691, 693-94 (5th Cir. 2020) (district court must give due consideration to the § 3553(a) factors); *United States v. Spriggs*, CCB-10-0364, 2021 WL 1856667, at *3 (D. Md. May 10, 2021) (court must consider the § 3553(a) factors).

As mentioned, the district court is "'empowered . . . to consider *any* extraordinary and compelling reason for release'" raised by a defendant. *McCoy*, 981 F.3d at 284 (citation omitted); *see Jenkins*, 22 F.4th at 169. Nevertheless, compassionate release is a "rare" remedy. *White v. United States*, 378 F. Supp. 3d 784, 787 (W.D. Mo. 2019); *see Chambliss*, 948 F.3d at 693-94; *United States v. Mangarella*, FDW-06-151, 2020 WL 1291835, at *2-3 (W.D. N.C. Mar. 16, 2020).

To be sure, "[a] district court need not provide an exhaustive explanation analyzing every § 3553(a) factor," nor is it "required to address each of a defendant's arguments when it considers a motion for compassionate release." *Jenkins*, 22 F.4th at 170; *see Chavez-Mena v. United States*, ___ U.S. ___, 138 S. Ct. 1959 (2018) (passim); *High*, 997 F.3d at 187. But, a district court abuses its discretion when it "act[s] arbitrarily or irrationally," "fail[s] to consider judicially recognized

15

factors constraining its exercise of discretion," "relie[s] on erroneous factual or legal premises," or "commit[s] an error of law." *High*, 997 F.3d at 187 (internal quotation marks omitted). And, "the court must provide an explanation sufficient 'to allow for meaningful appellate review' in light of the particular circumstances of the case." *Cohen*, 2022 WL 2314300, at *1 (quoting *High*, 997 F.3d at 190).

## IV.    COVID-19

### A.

The World Health Organization declared COVID-19 a global pandemic on March 11, 2020. *See Seth v. McDonough*, 461 F. Supp. 3d 242, 247 (D. Md. 2020).[7]   COVID-19 spawned "a public health crisis more severe than any seen for a hundred years." *Antietam Battlefield KOA v. Hogan*, CCB-20-1130, 461 F. Supp. 3d 214, 223 (D. Md. 2020), *aff'd in part, dismissed in part*, 2022 WL 1449180 (4th Cir. May 9, 2022) (per curiam).

On May 11, 2022, the United States "reached more than 1 million COVID-19 deaths, according to a Reuters tally, crossing a once-unthinkable milestone about two years after the first cases upended everyday life." Trevor Hunnicutt & Jeff Mason, *Biden marks one million U.S. COVID deaths after losing political battles*, Reuters (May 12, 2022), https://www.reuters.com/world/us/biden-marks-1-million-americans-dead-covid-2022-05-12/. And, as of July 13, 2022, COVID-19 has infected more than 88.9 million Americans. *See COVID-19 Dashboard*, The Johns Hopkins Univ., https://bit.ly/2WD4XU9 (last accessed July 13, 2022).

---

[7] Severe Acute Respiratory Syndrome Coronavirus 2 (SARS-CoV-2) is the cause of coronavirus disease 2019, commonly called COVID-19. *See Naming the Coronavirus Disease and the Virus that Causes It*, World Health Org., https://bit.ly/2UMC6uW   (last accessed June 15, 2020).

The judges of this Court "have written extensively about the pandemic." *United States v. Williams*, PWG-19-134, 2020 WL 3073320, at *1 (D. Md. June 10, 2020) (collecting cases). Therefore, it is not necessary to recount in detail the "unprecedented nature and impact" of the pandemic. *Id.* That said, the Court must reiterate that the COVID-19 pandemic has been described as the worst public health crisis that the world has experienced since 1918. *See United States v. Hernandez*, 451 F. Supp. 3d 301, 305 (S.D.N.Y. 2020) ("The COVID-19 pandemic . . . . presents a clear and present danger to free society for reasons that need no elaboration."). Indeed, the pandemic "produced unparalleled and exceptional circumstances affecting every aspect of life as we have known it." *Cameron v. Bouchard*, LVP-20-10949, 2020 WL 2569868, at *1 (E.D. Mich. May 21, 2020), *vacated on other grounds*, 815 F. App'x 978 (6th Cir. 2020).

For a significant period of time, life as we have known it came to a halt.  For quite some time, businesses and schools were shuttered or operated on a limited basis, in an effort to thwart the spread of the virus, which is highly contagious.  *See Coronavirus Disease 2019 (COVID-19), How COVID-19 Spreads*, CTRS. FOR DISEASE CONTROL & PREVENTION (Apr. 2, 2020), https://bit.ly/2XoiDDh.  The judiciary, too, faced many operational challenges.

People who are stricken with the virus sometimes experience only mild or moderate symptoms.  But, the virus can cause severe medical problems as well as death, especially for those in "high-risk categories . . . ."  *Antietam Battlefield KOA*, 461 F. Supp. 3d at 223 (citation omitted).

Of relevance here, the Centers for Disease Control and Prevention ("CDC") has identified certain risk factors that may increase the chance of severe illness due to the coronavirus.  The risk factors initially identified by the CDC included age (over 65); lung disease; asthma; chronic kidney disease; serious heart disease; obesity; diabetes; liver disease; and a compromised immune system. *See Coronavirus Disease 2019 (COVID-19), People Who Are at Risk for Severe Illness*, CTRS. FOR

DISEASE CONTROL & PREVENTION (May 14, 2020), https://bit.ly/2WBcB16.  But, the CDC has repeatedly revised its guidance as to medical conditions that pose a greater risk of severe illness due to COVID-19.  In May 2022, it updated its guidance to reflect the most available data.  *See People with Certain Medical Conditions*, CTRS. FOR DISEASE CONTROL & PREVENTION (May 2, 2022), https://bit.ly/38S4NfY.

According to the CDC, the factors that increase the risk include cancer; chronic kidney disease; chronic liver disease; chronic lung diseases, including COPD, asthma (moderate to severe), interstitial lung disease, cystic fibrosis, and pulmonary hypertension; dementia or other neurological conditions; diabetes (Type 1 and Type 2); disabilities, such as Down syndrome; heart conditions, such as heart failure, coronary artery disease, cardiomyopathies, and hypertension; HIV; being immunocompromised; liver disease; obesity, where the body mass index ("BMI") is 25 or higher; physical inactivity; pregnancy; sickle cell disease; smoking; solid organ or blood stem cell transplant; stroke or cerebrovascular disease; mental health conditions; substance use disorders; and tuberculosis.  *Id.*

The CDC has also indicated that the risk for severe illness from COVID-19 increases with age, with older adults at highest risk.  *See Older Adults At Greater Risk of Requiring Hospitalization or Dying if Diagnosed with COVID-19*, CTRS. FOR DISEASE CONTROL & PREVENTION (Nov. 27, 2020), https://bit.ly/3g1USZ1.  Furthermore, "[t]he risk of severe illness from COVID-19 increases as the number of underlying medical conditions increases in a person." *People with Certain Medical Conditions*, *supra*.

As to the CDC's risk factors, in the context of a motion for compassionate release, the Fourth Circuit has said that "use of a bright-line rule that accepts only the CDC's highest risk conditions is too restrictive."  *Hargrove*, 30 F.4th at 195.  In other words, there is no bright-line

rule predicated only on the CDC's identification of certain health conditions in the "highest risk category." *Id.* at 196.

Although there is currently no cure for the virus, medical treatments have continued to improve. And, significantly, we have seen the rollout of three vaccines for COVID-19 (Pfizer, Moderna, and Johnson & Johnson).[8] Initially, the vaccines were made available to health care workers, the elderly in nursing homes, and first responders. But, the criteria for eligibility has since been approved for all persons five years of age and older. *See* Cheyenne Haslett, *FDA Authorizes COVID-19 Vaccine for Kids 5-11*, ABC News, Oct. 29, 2021, https://abcnews.go.com/Politics/fda-authorizes-covid-19-vaccine-kids-11/story?id=80846188. Approximately 67% of the total U.S. population is fully vaccinated, including 30% of people from ages 5 to 11, 60% of people from ages 12 to 17, 73% of people from ages 18 to 64, and 92% of people age 65 and up. *See How Vaccinations Are Going in Your County and State*, N.Y. Times, https://www.nytimes.com/interactive/2020/us/covid-19-vaccine-doses.html (last visited July 13, 2022).

Moreover, approximately 106.6 million Americans have received a third or "booster" vaccine dose, which the CDC recommends for all persons age 18 and older. *See id.*; *COVID-19 Vaccine Booster Shots*, Ctrs. for Disease Control, https://www.cdc.gov/coronavirus/2019-ncov/vaccines/booster-shot.html (last updated June 13, 2022). And, federal regulators approved a second booster dose for individuals age 50 and older. *See* Cheyenne Haslett and Eric M. Strauss,

---

[8] Questions as to the efficacy of the Johnson & Johnson vaccine were raised as to the Delta and Omicron variants. *See J&J, Sinopharm, Sputnik V COVID-19 shots less effective against Omicron -study*, Reuters (Dec. 17, 2021), https://www.reuters.com/business/healthcare-pharmaceuticals/jj-sinopharm-sputnik-v-shots-weaker-against-omicron-study-shows-2021-12-17/; Apoorva Mandavilli, *J.&J. Vaccine May Be Less Effective Against Delta, Study Suggests*, N.Y. Times (July 20, 2021), https://www.nytimes.com/2021/07/20/health/coronavirus-johnson-vaccine-delta.html.

*Officials say everyone over 50 can get a 4th COVID shot, but 'especially important' for higher risk people*, ABC NEWS (Mar. 29, 2022), https://abcnews.go.com/Health/4th-covid-shot-authorized-fda-50/story?id=83730999.

For a brief time in the Fall of 2021, the country enjoyed a reduction of COVID-19 cases. *See* David Leonhardt, *Covid Cases Keep Falling*, N.Y. TIMES, Oct. 27, 2021, https://www.nytimes.com/2021/10/26/briefing/covid-cases-falling-delta.html ("The number of new daily COVID-19 cases has plunged since peaking on Sept.1. Almost as encouraging as the magnitude of the decline is its breadth: Cases have been declining in every region."). But, the trend was short-lived, due to the spread of the Delta variant and then the Omicron variant.

The Delta variant was thought to be more virulent than were earlier strains of COVID-19. *See Delta Variant: What We Know About the Science*, CTRS. FOR DISEASE CONTROL AND PREVENTION, https://www.cdc.gov/coronavirus/2019-ncov/variants/delta-variant.html (updated Aug. 6, 2021) (noting that the Delta variant is "more than [two times] as contagious as previous variants"); *see also* Jon Kamp & Brianna Abbott, *Delta Variant Recedes Across the United States*, WALL ST. J., Nov. 1, 2021, https://www.wsj.com/articles/delta-surge-of-covid-19-recedes-leaving-winter-challenge-ahead-11635672600 ("The Delta-fueled wave continues to take a serious toll, but the seven day average in reported deaths has dropped to about 1,400 a day from daily averages above 2,000 in late September, Johns Hopkins data show."); Apoorva Mandavilli, *What to Know About Breakthrough Infections and the Delta Variant*, N.Y. TIMES (Aug. 14, 2021), https://www.nytimes.com/article/covid-breakthrough-delta-variant.html (noting that, as of August 14, 2021, "[i]nfections have spiked to the highest levels in six months").

After the Delta variant, the Omicron variant emerged, both around the world and in the United States. It sparked further cause for concern, because it was highly contagious. *See Omicron*

20

*Variant: What You Need to Know*, CTRS. FOR DISEASE CONTROL & PREVENTION, https://www.cdc.gov/coronavirus/2019-ncov/variants/omicron-variant.html (last updated Dec. 13, 2021).  Indeed, Omicron contributed to a substantial and serious spike in COVID-19 cases.  *See, e.g.*, Aya Elamroussi, *"Omicron surge is 'unlike anything we've ever seen,' expert says,"* CNN (Dec. 31, 2021), https://www.cnn.com/2021/12/30/health/us-coronavirus-thursday/index.html.

Then, the number of COVID-19 cases again declined.  *See, e.g.*, Anabelle Timsit, *U.S. coronavirus cases are dropping. Other countries are breaking records.*, WASH. POST (Feb. 7, 2022),            https://www.washingtonpost.com/nation/2022/02/07/covid-omicron-variant-live-updates/#link-ZMG6VYX45VH5RAD3JX3IN3JF3Y.    And, the country began to return to normalcy.

Nevertheless, that respite did not last long.  We soon experienced another surge in COVID-19 cases.  *See, e.g.*, Anne Barnard, *Covid Cases Are Rising Again. How Cautious Should We Be?*, N.Y. TIMES (Apr. 7, 2022), https://www.nytimes.com/2022/04/07/nyregion/covid-cases-are-rising-again-how-cautious-should-we-be.html.   A new subvariant of the virus began "spreading rapidly" and soon became "the dominant form of the virus . . . ."   *See* Isabella Grullón Paz, *A new subvariant is spreading rapidly in the United States*, N.Y. TIMES (May 9, 2022), https://www.nytimes.com/live/2022/05/04/world/covid-19-mandates-vaccine-cases.    As of July 2022, the BA.5 variant of COVID-19, an "offshoot of the Omicron variant," is "spreading quickly," buttressed by an increased ability to overcome "some of the immune defenses acquired by vaccinated people, or those infected by earlier variants."  Ed Yong, *Is BA.5 the 'Reinfection Wave'?*, THE ATLANTIC (July 11, 2022), https://www.theatlantic.com/health/archive/2022/07/ba5-omicron-variant-covid-surge-immunity-reinfection/670485/.    And, the "Biden administration is preparing for the possibility that 100 million Americans will be infected with the coronavirus this

fall and winter . . . ."   Amelia Nirenberg, *A Coming Fall Surge?*,  N.Y. TIMES (May 9, 2022),

https://www.nytimes.com/2022/05/09/briefing/100-million-coronavirus-covid-us.html.

**B.**

At the outset of the pandemic, in an effort to stem the spread of the virus, people were

urged to practice "social distancing" and to wear masks. *See Coronavirus Disease 2019 (COVID-*

*19), How to Protect Yourself & Others*, CTRS. FOR DISEASE CONTROL & PREVENTION,

https://bit.ly/3dPA8Ba (last accessed December 9, 2020).   However, social distancing is

particularly difficult in the penal setting. *Seth*, 2020 WL 2571168, at *2; *Senate Judiciary Hrg.*

*Transcript on Incarceration during COVID-19*, REV.COM (June 2, 2020) (Testimony of BOP Dir.

Michael Carvajal at 47:00) ("Prisons by design are not made for social distancing. They are on

[sic] the opposite made to contain people in one area.").   Indeed, prisoners have little ability to

isolate themselves from the threat posed by the coronavirus. *Id*.; *see Cameron*, 2020 WL 2569868,

at *1; *see also United States v. Mel*, TDC-18-0571, 2020 WL 2041674, at *3 (D. Md. Apr. 28,

2020) ("In light of the shared facilities, the difficulty of social distancing, and challenges relating

to maintaining sanitation, the risk of infection and the spread of infection within prisons and

detention facilities is particularly high.").   Prisoners usually "share bathrooms, laundry and eating

areas," and are often "bunked in the same cell" with several others.   Amanda Klonsky, *An*

*Epicenter of the Pandemic Will Be Jails and Prisons, if Inaction Continues*, N.Y. TIMES (Mar. 16,

2020).   And, they are not free to follow their own rules.

To illustrate, prisoners are not readily able to secure safety products on their own to protect

themselves, such as masks and hand sanitizers, nor are they necessarily able to separate or distance

themselves from others. *See* Kim Bellware, *Prisoners and Guards Agree About Federal*

*Coronavirus Response: 'We do Not Feel Safe*,' WASH. POST (Aug. 24, 2020) (reporting use of non-

reusable masks for months and a lack of transparency around policies for personal protective equipment and testing). They do not get to decide where, when, or how to eat or sleep. Consequently, correctional facilities are especially vulnerable to viral outbreaks and ill-suited to stem their spread. *See Coreas v. Bounds*, TDC-20-0780, 2020 WL 1663133, at *2 (D. Md. Apr. 3, 2020) ("Prisons, jails, and detention centers are especially vulnerable to outbreaks of COVID-19."); *see also* Eddie Burkhalter et al., *Incarcerated and Infected: How the Virus Tore Through the U.S. Prison System*, N.Y. TIMES (Apr. 16, 2021) (stating that the "cramped, often unsanitary settings of correctional institutions have been ideal for incubating and transmitting the disease. Social distancing is often not an option."); Letter of 3/25/20 to Governor Hogan from approximately 15 members of Johns Hopkins faculty at the Bloomberg School of Public Health, School of Nursing, and School of Medicine (explaining that the "close quarters of jails and prisons, the inability to employ effective social distancing measures, and the many high-contact surfaces within facilities, make transmission of COVID-19 more likely"); *accord Brown v. Plata*, 563 U.S. 493, 519-20 (2011) (referencing a medical expert's description of the overcrowded California prison system as "'breeding grounds for disease'") (citation omitted).

On March 23, 2020, the CDC issued guidance for the operation of penal institutions to help prevent the spread of the virus. *Seth*, 2020 WL 2571168, at *2. Notably, the BOP implemented substantial measures to mitigate the risks to prisoners, to protect inmates from COVID-19, and to treat those who are infected. As the Third Circuit recognized in *United States v. Raia*, 954 F.3d 594, 597 (3rd Cir. 2020), the BOP made "extensive and professional efforts to curtail the virus's spread."[9]

---

[9] In June 2020, the *New York Times* reported that cases of COVID-19 had "soared in recent weeks" at jails and prisons across the country. Timothy Williams et al., *Coronavirus cases Rise Sharply in Prisons Even as They Plateau Nationwide*, N.Y. TIMES (June 18, 2020),

The Department of Justice ("DOJ") recognized the unique risks from COVID-19 experienced by inmates and employees of the BOP.  The DOJ adopted the position that an inmate who presents with one of the risk factors identified by the CDC should be considered as having an "extraordinary and compelling reason" warranting a sentence reduction.  *See* U.S.S.G. § 1B1.13 cmt. n.1(A)(ii)(I).

On March 26, 2020, then Attorney General William Barr issued a memorandum to Michael Carvajal, Director of the BOP, instructing him to prioritize the use of home confinement for inmates at risk of complications from COVID-19.  *See Hallinan v. Scarantino*, 20-HC-2088-FL, 2020 WL 3105094, at *8 (E.D. N.C. June 11, 2020).  And, on March 27, 2020, Congress passed the Coronavirus Aid, Relief, and Economic Security Act (the "CARES Act"), Pub. L. No. 116-136, 134 Stat. 281.  In relevant part, the CARES Act authorized the Director of BOP to extend the permissible length of home confinement, subject to a finding of an emergency by the Attorney General.  *See* Pub. L. No. 116-136, § 12003(b)(2).  On April 3, 2020, then Attorney General Barr issued another memorandum to Carvajal, finding "the requisite emergency . . . ."  *Hallinan*, 2020

---

https://nyti.ms/37JZgH2; On October 29, 2020, the *New York Times* reported that "[i]n American jails and prisons, more than 252,000 people have been infected and at least 1,450 inmates and correctional officers have died" from COVID-19. *See Cases in Jails and Prisons*, N.Y. TIMES (Oct. 29, 2020). On November 21, 2020, the *New York Times* reported that "U.S. correctional facilities are experiencing record spikes in coronavirus infections this fall. During the week of Nov. 17, there were 13,657 new coronavirus infections reported across the state and federal prison systems*." America Is Letting the Coronavirus Rage Through Prisons*, N.Y. TIMES (Nov. 21, 2020), https://www.nytimes.com/2020/11/21/opinion/sunday/coronavirus-prisons-jails.html.

On April 16, 2021, the *New York Times* reported that at least 39% of prisoners are known to have been infected in federal facilities. Eddie Burkhalter et al., *Incarcerated and Infected: How the Virus Tore Through the U.S. Prison System*, N.Y. TIMES (Apr. 10, 2021). And, according to the article, the actual count is most likely much higher "because of the dearth of testing." *Id.* Nevertheless, with the passage of time, the outbreaks of COVID-19 have declined.

WL 3105094, at *9.  That memorandum "had the effect of expanding the [BOP's] authority to grant home confinement to any inmate . . . ." *Id.*

Two BOP officials, Andre Matevousian, then Acting Assistant Director of the Correctional Programs Division, and Hugh Hurwitz, then Assistant Director of the Reentry Services Division, issued a memorandum on May 8, 2020, to implement the Attorney General's directives on the increased use of home confinement.  The memorandum provided that the BOP was prioritizing the review of inmates for home confinement, as to inmates who have either served a certain portion of their sentence or who only have a short amount of time remaining on their sentence.

On January 4, 2021, at about the time of the vaccine rollout, the BOP published "COVID-19 Vaccine Guidance."  *See COVID-19 Vaccine Guidance*, Federal Bureau of Prisons Clinical Guidance  (Jan.  4,  2021),  https://www.bop.gov/resources/pdfs/2021_covid19_vaccine.pdf.  It provides that administration of the COVID-19 vaccine (Pfizer and Moderna) will "align with [recommendations of] the Centers for Disease Control and Prevention."  *Id.* at 4.  Its plan was for prisoners at heightened risk to receive priority for the vaccine. *Id.* at 6.

The BOP reportedly received its first shipment of vaccines on December 16, 2020. Walter Pavlo, *Federal Bureau of Prisons Starts Vaccination of Staff, Inmates Soon Thereafter*, FORBES (Dec.  21,  2020),  https://www.forbes.com/sites/walterpavlo/2020/12/21/  federal-bureau-of-prisons-starts-vaccination-of-staff-inmates-soon-thereafter/?sh=5683b99aa96f.  As  of  July  13, 2022, the BOP had 140,262 federal inmates and approximately 36,000 staff.  And, by that date, the BOP had administered 323,911 vaccine doses to staff and inmates.  *See* BUREAU OF PRISONS, https://www.bop.gov/coronavirus/ (last accessed July 13, 2022).

As of July 13, 2022, the BOP reported that 520 federal inmates, out of a total population of 140,262, and 323 BOP staff, out of some 36,000 staff members, currently tested positive for

COVID-19.  Moreover, 49,809 inmates and 13,187 staff have recovered from the COVID-19 virus. In addition, 301 inmates and seven staff members have died from the virus.  The BOP has completed 128,696 COVID-19 tests.  *See* https://www.bop.gov/coronavirus/, *supra*.

Defendant tested positive for COVID-19 in January 2021.  ECF 113 at 140.  He denied any symptoms, however.  *Id.* at 129-34.  Moreover, in March 2021, defendant had his second dose of the Pfizer vaccine.  *Id.* at 144.

With respect to FCI Cumberland, where the defendant is imprisoned, the BOP reported that as of July 13, 2022, out of a total of 1,286 inmates, zero inmates have tested positive; zero staff members have tested positive; zero inmates have died of COVID-19, and 364 inmates and 133 staff have recovered at the facility.  In addition, 250 staff members and 1,189 inmates have been inoculated with the vaccine.  *See* https://www.bop.gov/coronavirus/, BUREAU OF PRISONS, https://www.bop.gov/locations/institutions/cum/ (last visited July 13, 2022).

## V.    Discussion

Spence primarily argues that extraordinary and compelling circumstances exist by reason of the general dangers of COVID-19.  However, fear or concern of COVID-19, without the presence of additional factors, does not constitute an extraordinary and compelling circumstance that warrants an inmate's release. Judge Chasanow of this court has explained: "While all share the concern of the public health challenges caused by COVID-19, and appreciate the heightened anxiety experienced by those incarcerated in correctional facilities ..., generalized and unspecific reasons ... do not satisfy the standard for compassionate release." *United States v. Harris*, DKC-08-319, 2020 WL 2512420, at *1 (D. Md. May 15, 2020).

In a footnote, Spence identifies two of his health conditions that he claims render him especially vulnerable to COVID-19. ECF 100 at 4 n.3.  In particular, he alleges that, in light of his

obesity and his hypertension, the ongoing COVID-19 pandemic poses a particular risk to his health. ECF 100 at 4 n.3.   The government argues that Spence has failed to demonstrate extraordinary and compelling circumstances, *i.e.*, the first step under the compassionate release framework. ECF 107 at 2, 17-23.

BOP medical records (ECF 113) indicate that as of February 10, 2021, Spence was 71 inches tall and weighed 241 pounds, resulting in a BMI of 33.6.   *Id.* at 8, 124. According to the CDC, this renders defendant obese.   *See Certain Medical Conditions, supra*.

I am mindful that the CDC's criteria are not binding in the analysis of whether a health condition qualifies as an extraordinary or compelling basis for compassionate release. *See Hargrove*, 30 F.4th at 194. Nevertheless, the criteria provide useful information.  And, the CDC has identified obesity as an underlying health condition that "can make you more likely to get very sick from COVID-19."

Numerous courts have found that, in light of the COVID-19 pandemic, obesity, particularly when combined with other chronic medical conditions, can qualify as a compelling reason for compassionate release.  *See, e.g.*, *United States v. Smith*, 538 F. Supp. 3d 990, 995 (E.D. Cal. 2021) ("Many courts have also found that people who have a body mass index within the ranges defined as 'overweight' or 'obese' are at greater risk of severe COVID-19."); *United States v. Staten*, PJM-01-284-4, 2020 WL 4904270, at *2 (D. Md. Aug. 18, 2020) (finding an "extraordinary and compelling reason" for compassionate release based on a BMI of 38); *United States v. Williams*, PWG-19-134, 2020 WL 3073320 (D. Md. June 10, 2020) (finding obese defendant with a BMI of 32.5 qualified for compassionate release in light of COVID-19); *United States v. Quintero*, 08-CR-6007L, 458 F.Supp.3d 130, 132 (W.D.N.Y. 2020) (finding defendant's diabetes, compromised immune system, obesity, and hypertension satisfied an extraordinary and compelling reason);

27

*United States v. Dawson*, No. 18-40085, 2020 WL 1812270, at *7 (D. Kan. Apr. 9, 2020) (granting compassionate release based on a defendant's obesity).

On the other hand, a number of courts have declined to award compassionate release based on obesity. *See, e.g.*, *United States v. Waugh-Hixon*, PWG-19-137, 2021 WL 4750713, at *3 (D. Md. Oct. 21, 2021) (BMI of 30); *United States v. Jones*, RDB-10-232, 2021 WL 2805947, at *3 (D. Md. July 6, 2021) ("Several district courts have held that obesity is not individually sufficient for a finding that there are circumstances akin to the 'extraordinary and compelling reasons' which justify compassionate release."); *United States v. Moore*, Crim. No. 18-474, 2021 WL 308331, at *2 (E.D. Penn. Jan. 29, 2021) (finding that defendant's "slightly elevated BMI of 25 does not justify his release," and noting that "[c]ourts have consistently denied compassionate release to inmates with significantly higher BMI levels"); *United States v. Carter*, PWG-17-0529, 2021 WL 307417, at *3 (D. Md. Jan. 29, 2021) (noting "multiple cases denying compassionate release to defendants with obesity and a preexisting condition that increased defendants' risk of severe illness"); *United States v. Peaks*, No. 16-20460, 2020 WL 2214231 (E.D. Mich. May 7, 2020) (inmate with BMI of 44 and hypertension does not meet test for extraordinary and compelling circumstances).

Spence also claims that he is especially vulnerable to COVID-19 due to his hypertension. ECF 100 at 4 n.3. The CDC has noted that "high blood pressure (hypertension)" potentially "can make you more likely to get very sick from COVID-19." *People with Certain Medical Conditions*, *supra*.

On July 31, 2019, the defendant's blood pressure was 117/81. ECF 113 at 7. His medical records indicate that as of July 31, 2019, he had been prescribed hydrochlorothiazide to treat his high blood pressure, but had stopped taking it because he felt "dizzy/lightheaded" when he took

it. ECF 113 at 7. Notably, Spence's BOP medical records state that as of July 31, 2019, his hypertension was "resolved with [weight] loss and salt avoidance." *Id*. (italics removed). The most recent blood pressure reading in the BOP medical records is dated December 28, 2020. *Id*. at 86. It shows a blood pressure of 103/57. *Id*. That reading is not consistent with hypertension. Defendant's medical records do not reflect that he was prescribed medication for high blood pressure at that time.

Courts have found that, in light of the COVID-19 pandemic, hypertension, combined with other conditions, qualifies as a compelling reason for compassionate release. *See, e.g.*, *United States v. Thomas*, 471 F. Supp. 3d 745, 749 (W.D. Va. 2020) ("[C]ourts...across the country have released individuals suffering from hypertension, but only when these individuals also suffered from other underlying medical conditions."); *United States v. Hilow*, No. 15-170-JD, 2020 WL 2851086, at *4 (D. N.H. June 2, 2020) (involving asthma, migraines, hypertension, high cholesterol, prediabetes, and borderline obesity); *United States v. Gutman*, RDB-19-0069, 2020 WL 24674345, at *2 (D. Md. May 13, 2020) (finding defendant's age of 56 years, multiple sclerosis, and hypertension satisfied extraordinary and compelling reason); *United States v. Coles*, No. 00-cr-20051, 2020 WL 1976296, at *7 (C.D. Ill. Apr. 24, 2020) (granting compassionate release to defendant with hypertension, prediabetes, prostate issues, bladder issues, and a dental infection); *United States v. Zukerman*, 451 F. Supp. 3d 329, 336 (S.D.N.Y. 2020) (concluding that defendant's diabetes, hypertension, obesity, and age satisfied extraordinary and compelling reason).  There are also some cases in which courts have found extraordinary and compelling circumstances when hypertension is the sole condition. *See, e.g.*, *United States v. Salvagno*, 456 F. Supp. 3d 420, 423, 427-29 (N.D.N.Y. 2020); *United States v. Sawicz*, 453 F. Supp. 3d 601, 604-05 (E.D.N.Y. 2020).

The government argues that Spence is not at risk from COVID-19 because he has received the COVID-19 vaccine; the defendant was previously infected with COVID-19 and did not suffer severe complications; and COVID-19 is not spreading uncontrollably at FCI Cumberland. ECF 107 at 18. However, a defendant's eligibility for compassionate release is not defeated because a defendant has had COVID-19 or because he has been vaccinated.

It is well documented that "reinfections do occur after COVID-19." *Reinfections and COVID-19*, CTRS. FOR DISEASE CONTROL AND PREVENTION, https://www.cdc.gov/coronavirus/2019-ncov/your-health/reinfection.html (last updated Jan. 20, 2022); *see also, e.g.*, *United States v. Fletcher*, TDC-05-0179, 2020 WL 3972142, at *3 (D. Md. July 13, 2020); *United States v. Heyward*, PWG-17-0527, 2020 WL 3547018, at *2 (D. Md. June 30, 2020). Moreover, the government's argument that COVID-19 vaccination eliminates the risk to Spence posed by COVID-19 is not persuasive.

The COVID-19 vaccines have been useful in reducing the health risks posed by the coronavirus. But, they are not entirely effective, particularly as to the latest variants. "The variants have shown a remarkable ability to get around the protection offered by infection and vaccination." Carla K. Johnson, *Experts decry little action as COVID-19 cases surge*, BALT. SUN (July 14, 2022). Albeit in rare cases, vaccinated individuals have died due to COVID-19. *See Rates of COVID-19 Cases and Death by Vaccination Status*, CTRS FOR DISEASE CONTROL AND PREVENTION, https://covid.cdc.gov/covid-data-tracker/#rates-by-vaccine-status (last updated Apr. 4, 2022). Therefore, the fact of vaccination or prior infection does not eliminate concerns about underlying health conditions that might otherwise render an individual eligible for compassionate release. *See United States v. Palmer*, PWG-13-623, 2021 WL 3212586, at *3 (D. Md. July 29, 2021) ("It is impossible to predict the impact of the vaccines on future strains of the virus, just as it is impossible

to predict the impact of COVID-19 on [defendant's] specific medical issues."); *Spriggs*, 2021 WL 1856667, at *3 (inmate having received vaccine "does not negate that his underlying health conditions make him eligible for compassionate release.").

Several judges of this Court have concluded that an inmate is eligible for compassionate release notwithstanding vaccinated status. *See, e.g.*, *United States v. Jenkins*, DKC-12-0043, 2021 WL 5140198, at *4-5 (D. Md. Nov. 4, 2021) (granting compassionate release to a defendant based on his obesity and chronic kidney disease, in spite of the fact that he was fully vaccinated against COVID-19); *United States v. Garcia*, CCB-11-569, 2021 WL 4846937, at *2 (D. Md. Oct. 15, 2021) (finding that a vaccinated defendant's diabetes and hypertension constituted extraordinary and compelling circumstances); *United States v. Hussain*, PWG-13-661, 2021 WL 3367822, at *4 (D. Md. Aug. 3, 2021) (explaining that a fully vaccinated defendant with a history of smoking as well as a number of underlying conditions, including moderate asthma and hypertension, presented an extraordinary and compelling reason for his release).

But, even assuming that Spence has demonstrated extraordinary and compelling circumstances by virtue of his health conditions, the sentencing factors militate against his release.

Even when a court finds extraordinary and compelling reasons for compassionate release, relief is appropriate under 18 U.S.C. § 3582(c)(1)(A) only if appropriate in light of the factors set forth in 18 U.S.C. § 3553(a). *See High*, 997 F.3d at 186. These include: (1) the nature of the offense and the defendant's characteristics; (2) the need for the sentence to reflect the seriousness of the offense, promote respect for the law, and provide just punishment; (3) the kinds of sentences available and the applicable Guidelines range; (4) any pertinent Commission policy statements; (5) the need to avoid unwarranted sentence disparities; and (6) the need to provide restitution to victims. *Id*. The Motion falters in light of these factors.

31

Spence's crime was quite serious. He transported two minor females, ages 15 and 17 years old, from New Jersey to Maryland for the purpose of conducting commercial sex acts. ECF 54 at 9. As a direct result, the minor females engaged in sex acts with customers for money. ECF 54 at 9-10. When police arrived at the hotel, Spence, Thompson, and Destiny abandoned the minor females and fled to New Jersey. ECF 54 at 10. And, defendant had a history of similar conduct. *Id.* at 9.

Furthermore, defendant has a serious and extensive criminal history. He has been convicted, *inter alia*, of unlawful possession of a handgun; possession of a controlled substance within 500 feet of a school; and possession with intent to distribute heroin. ECF 79, ¶¶ 51-55.

Moreover, the sentence here of 75 months was quite lenient.  It is well below the Guidelines range, which recommended a sentence of 292 to 365 months. *Id*. ¶ 87. Additionally, the sentence is on the lower end of the stipulated range of 60 to 120 months.

In ruling on the Motion, the Court also considers the defendant's post-sentencing conduct. *See Pepper v. United States*, 562 U.S. 476, 490 (2011) (citing 18 U.S.C. § 3553(a)(1)). While he has been incarcerated, Spence obtained a GED and completed the non-residential drug abuse program. *See* ECF 109-1. This rehabilitative effort is certainly commendable.

The government notes that this Court has already denied Thompson's request for compassionate release. ECF 107 at 25. In particular, Thompson filed a compassionate release request in July 2020, albeit styled as a letter. ECF 96. The Court denied it for failure to exhaust administrative remedies. ECF 98. On May 17, 2021, Thompson filed a second letter requesting a "reconsideration of time/time reduction." ECF 102. The Court declined to reduce the sentence, because she had not provided any grounds to do so. ECF 105. The government asserts that, compared to Spence, Thompson has done more to rehabilitate herself, and had post-incarceration

plans. ECF 107 at 25. Therefore, the government argues that it would be an "extreme and wholly unjustified" disparity between the two codefendants to provide release or reduction for Spence, but not Thompson. *Id*.

In his Reply, Spence raises two additional issues in support of his Motion. *See* ECF 109. First, he seeks to rebut the government's assessment that he is a threat to the community. *Id.* at 1-2. Defendant claims that he is not a threat to the community because the government did not object to his pretrial home confinement; the government agreed to a modification of his pretrial release to enable defendant to obtain employment; and, on February 8, 2019, the government stated that defendant was "remorseful" for his criminal conduct. and that it had no objection to providing the defendant a 90-day period to self-surrender. *Id.* But, these facts are of minimal relevance to the question of compassionate release.

Second, the defendant offers a lengthy and unclear argument that appears to be related to a dispute as to his BOP custody points. *Id.* at 2-5. He maintains that the incorrect classification of his custody points caused him to be incorrectly held at USP Canaan, a high-security prison, and that this mistake should be an extraordinary and compelling circumstance that factors into the Court's decision. But, Spence is now incarcerated at FCI Cumberland.

With defendant's credit for time in pretrial detention on a related state charge, from December 20, 2017, to May 30, 2018, Spence has served about 45 months of his 75-month sentence, or approximately 60%. This is not an insignificant amount. However, given the gravity of Spence's offense, his criminal history, and the leniency of the sentence, a further reduction is not warranted.

### VI.     Conclusion

As mentioned, compassionate release is a "rare" remedy.  *White*, 378 F. Supp. 3d at 787.

And, it is reserved for the "most grievous cases."  *McCoy*, 981 F.3d at 287.  The Court must make

an "individualized assessment[ ]," *id*. at 286; *see also Harris*, 2022 WL 636627, at *1; *Davis*, 2022

WL 127900, at *1-2.  For the reasons stated, I will deny the Motion, without prejudice.

An Order follows, consistent with this Memorandum Opinion.


Date: July 15, 2022                                    _____/s/_____

                                                        Ellen L.  Hollander
                                                        United States District Judge

34